# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF LOUISIANA

IN RE:

**BELTWAY 8 ASSOCIATES, LIMITED PARTNERSHIP     CASE NO. 11-10001**
**d/b/a WATERMARKE APARTMENTS**

      **DEBTOR**                       **CHAPTER 11**
**************************************************************************

## AMENDED DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AS OF APRIL 4, 2011

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE CHAPTER 11 PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THERE WILL BE A HEARING ON THIS DISCLOSURE STATEMENT TO DETERMINE IF IT PROVIDES ADEQUATE INFORMATION. IF THE DISCLOSURE STATEMENT IS APPROVED BY THE BANKRUPTCY COURT, THERE WILL BE A SUBSEQUENT HEARING TO CONSIDER CONFIRMATION OF THE PLAN. ALL CREDITORS AND EQUITY INTEREST HOLDERS WILL BE NOTIFIED OF THE DATE OF SUCH CONFIRMATION HEARING.**

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

TABLE OF CONTENTS

**EXHIBITS TO DISCLOSURE STATEMENT** ........................................................................ **V**

**INTRODUCTION**.................................................................................................................. **1**

**I. PURPOSE AND SUMMARY OF THE PLAN** ................................................................. **1**

**II. SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND**

**INTERESTS UNDER THE PLAN**.......................................................................................... **2**

    A. TREATMENT OF CLAIMS AND INTERESTS.......................................................................... 2

    B. CLAIMS UNDER THE PLAN ................................................................................................ 2

    C.  INTERESTS UNDER THE PLAN............................................................................................ 5

**III. GENERAL OVERVIEW AND BACKGROUND INFORMATION**.............................. **5**

    A.  BACKGROUND AND GENERAL INFORMATION .................................................................... 5

       1. OVERVIEW AND BACKGROUND OF THE DEBTOR .................................................................. 5

       2. DEBTOR'S CORPORATE STRUCTURE ................................................................................... 5

    C. THE DEBTOR'S DEBT STRUCTURE...................................................................................... 6

    D. EVENTS LEADING TO THE CHAPTER 11 CASE...................................................................... 6

    E. SIGNIFICANT POST-PETITION EVENTS ............................................................................... 8

       1. CONTINUATION OF BUSINESS; STAY OF LITIGATION. .......................................................... 9

       2. FIRST DAY PLEADINGS...................................................................................................... 10

       3. COMPLIANCE WITH BANKRUPTCY CODE, BANKRUPTCY RULES, LOCAL COURT RULES, AND

       U.S. TRUSTEE DEADLINES. ................................................................................................. 10

**IV. THE PLAN**...................................................................................................................... **10**

    A. VALUATION OF THE DEBTOR ............................................................................................ 11

B. Treatment of Unclassified Claims Under the Plan.................................................... 11

    1. Administrative Claims............................................................................. 12

    2.  Priority Tax Claims............................................................................. 13

C. Treatment of Classified Claims Under the Plan ...................................................... 14

D. Treatment of Classified Interests Under the Plan .................................................... 16

E. Means for Execution and Implementation of the Plan.............................................. 17

F. Objections to Claims/Administrative Claims/Interests ........................................... 18

G. Claims Against Others ............................................................................................ 18

H. Execution of Documents and Partnership Action.................................................... 19

**V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.......... 19**

A. Assumption .............................................................................................................. 19

B. Rejection.................................................................................................................. 20

C. Cure Payments, Compensation For Pecuniary Loss, And Adequate Assurance.... 20

**VI.  POST-CONFIRMATION MANAGEMENT AND COMPENSATION........................ 21**

**VII.  LITIGATION............................................................................................................... 21**

A. Pending Lawsuits ..................................................................................................... 21

B. Potential Actions ..................................................................................................... 21

**VIII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES................................ 22**

**IX. LIQUIDATION ANALYSIS UNDER CHAPTER 7 ......................................... 23**

**X. CONFIRMATION PROCEDURE.................................................................................. 26**

A. Voting and Other Procedures.................................................................................. 26

B. Disclaimers And Endorsements ............................................................................... 29

C. THE CONFIRMATION HEARING ............................................................................. 30

D. CONFIRMATION ............................................................................................... 30

E. UNFAIR DISCRIMINATION AND FAIR AND EQUITABLE TESTS.................................. 31

F. FEASIBILITY .................................................................................................... 33

G. BEST INTEREST TEST....................................................................................... 33

H. CERTAIN RISK FACTORS TO BE CONSIDERED ...................................................... 34

I. CERTAIN BANKRUPTCY CONSIDERATIONS............................................................ 35

**XI. CONCLUSION AND RECOMMENDATION................................................... 36**

# EXHIBITS TO DISCLOSURE STATEMENT

EXHIBIT D-1 CHAPTER 11 PLAN OF REORGANIZATION

EXHIBIT D-2 O'CONNOR & ASSOCIATES MARKET DATA

EXHIBIT D-3 FINANCIAL OPERATING STATEMENTS FOR THE DEBTOR

EXHIBIT D-4 NATIONAL APARTMENT ASSOCIATION ARTICLE

EXHIBIT D-5 FINANCIAL PROJECTIONS

EXHIBIT D-6 PRE-PETITION FINANCIAL STATEMENTS (To be provided).

<u>**INTRODUCTION**</u>

Beltway 8 Associates, Limited Partnership referred to as "Beltway or the "Debtor", or on and after the Effective Date of the Plan, the "Reorganized Debtor", has filed its Debtor's Plan of Reorganization dated April 4, 2011 (the "Plan"). The Plan is attached to this Amended Disclosure Statement as **Exhibit D-1**. The Debtor submits this Amended Disclosure Statement (this "Disclosure Statement"), pursuant to Section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), to holders of Claims against and Interests in the Debtor, in connection with (i) the solicitation of acceptances or rejections of the Plan (together with any modification, amendment or supplement, of the Plan), and (ii) the hearings to consider approval of the Plan to be scheduled before the United States Bankruptcy Court for the Middle District of Louisiana (the "Bankruptcy Court") on the date(s) set forth in the accompanying notice.

In the event of a conflict or difference between the definitions used, and provisions contained, in this Disclosure Statement and the Plan, the definitions and provisions contained in the Uniform Glossary of Defined Terms for Plan, Disclosure Statement and Plan Documents shall control.

<u>**I. PURPOSE AND SUMMARY OF THE PLAN**</u>

THE DESCRIPTION OF THE PLAN SET FORTH BELOW CONSTITUTES A SUMMARY ONLY. HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW AND ANALYZE THE PLAN IN ITS ENTIRETY.

The primary purpose of the Plan is to reorganize the debts of the Debtor and pay all Allowed Claims in full.

# II. SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

## A. TREATMENT OF CLAIMS AND INTERESTS

The Plan contemplates payment of all Allowed Claims against the Debtor based upon the cash flow created through the Debtor's business operations. The holders of Equity Interests will not receive any distribution unless the Debtor is current on its payments to FST Watermarke, L.L.C., and all other Allowed Claims have been paid in full.

## B. CLAIMS UNDER THE PLAN

The following is a summary of the classification and treatment of Claims under the Plan:

| CLASS | TREATMENT |
|---|---|
| **Unclassified. Allowed Administrative Expense Claims.**<br><br>Approximately $45,000.00 owed to Steffes, Vingiello & McKenzie and Fleenor, Green & McKinney as of March 31, 2011, and additional fees and expenses will be incurred through the Effective Date. | Unimpaired. Not entitled to vote.<br><br>On the later of (i) the Effective Date or (ii) the date on which an Administrative Expense Claim becomes Allowed, the Reorganized Debtor shall either (a) pay to each Holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim, or (b) satisfy and discharge such Administrative Expense Claim in accordance with such other terms that the Reorganized Debtor and such Holder shall have agreed upon in writing; *provided, however,* that such agreed-upon treatment shall not be more favorable than the treatment provided in subsection (a).<br><br>Requests for payment of Administrative Expense Claims and hearing notices related thereto shall be Filed and properly served in accordance with the local rules of the Bankruptcy Court no later than thirty (30) days after the Effective Date. Such request shall include at a minimum (a) the name of the Holder of the Administrative Expense Claim, (b) the amount of the Administrative Expense Claim and (c) the basis for the Administrative Expense Claim. Failure to file and serve such request and related notice(s) timely and properly shall result in the Administrative Expense Claim being forever barred and discharged.<br><br>All professionals or other entities requesting compensation or reimbursement of expenses under sections 327, 328, 330, 331, 333, 503(b), 506 and 1103 of the Bankruptcy Code for services rendered before the Effective Date (including any compensation requested by any professional for any other entity for making a substantial contribution in the Reorganization Case) shall File and serve on the Reorganized Debtor an application for final allowance of compensation and reimbursement of expenses no later than thirty (30) days after the Effective Date.<br><br>Holders of Administrative Expense Claims based on unpaid and undisputed amounts due by the Debtor in Possession for goods and services provided to it |

| | after the Petition Date and before the Effective Date arising in the ordinary course of the Debtor's business shall not be required to file any request for payment of such Claims but each shall be deemed to be an Allowed Administrative Expense Claim in the undisputed amount recognized by the Debtor in Possession. Such deemed Allowed Administrative Expense Claims shall be paid in the ordinary course of business by the Reorganized Debtor without any further action by the Holders of such Claims.<br><br>Estimated percentage recovery: 100% |
|---|---|
| **Unclassified: Allowed Priority Tax Claims.**<br><br>The total estimate of Allowed Priority Tax Claims is approximately $510,533.14<br><br>Unimpaired. Not entitled to vote. | Except to the extent that the Reorganized Debtor and a Holder of an Allowed Priority Tax Claim against the Debtor agree to a different treatment, each Holder of an Allowed Priority Tax Claim against the Debtor shall receive, at the sole option of the Reorganized Debtor, (a) on the Effective Date, Cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim, or (b) commencing 45 days after the occurrence of the Effective Date and continuing over a period not exceeding five (5) years from and after the Order For Relief Date, equal quarterly Cash payments in an aggregate amount equal to the unpaid portion of such Allowed Priority Tax Claim, together with interest at the applicable rate under nonbankruptcy law, subject to the sole option of the Reorganized Debtor, as applicable, to prepay the entire amount of the unpaid portion of Allowed Priority Tax Claim and in a manner not less favorable than the most favored nonpriority unsecured Claim provided for by the Plan. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due. Any Priority Tax Claim secured by a lien shall retain such lien to secure its claim until paid in full.<br><br>Estimated percentage recovery: 100% |
| **Class 1 – Tenant Deposit Claims**<br><br>The total estimate of the Allowed Class 1 Claim is approximately $65,880.00.<br><br>Unimpaired. Not entitled to vote. | Each Holder of an Allowed Tenant Deposit Claim shall retain its legal, equitable, and contractual rights to which it may be entitled under state law.<br><br>Estimated percentage recovery: 100% |
| **Class 2 – FST Watermarke, LLC Secured Claim**<br><br>The total estimate of the Allowed Class 2 Claim is approximately $21,250,300.00+ accrued unpaid interest through the Confirmation Date and any additional Allowed amounts under 11 U.S.C. § 506(b).<br><br>Impaired. Entitled to vote. | On the Effective Date, all accrued unpaid interest calculated at the non-default contractual rate of 4% per annum (or at such other rate as the bankruptcy court determines to be appropriate) plus any amounts Allowed by the bankruptcy Court pursuant to 11 U.S.C. § 506(b) shall be capitalized and added to the outstanding principal balance of $21,250,000.00 due under the FST Watermarke Note ("the New Principal Balance"). As permitted under 11 U.S.C. § 1123(a)(5)(H), the maturity of the FST Watermarke Note shall be extended to sixty (60) months from the Effective Date ("the New Maturity Date"). The Debtor shall then repay the New Principal Balance with interest accruing at the non-default contractual rate of 200 basis points (2.0%) in excess of LIBOR (as defined in the FST Watermarke Note) provided that the applicable Rate of interest shall be not less than 4% per annum from the Effective Date (or if the Plan is confirmed pursuant to 11 U.S.C. §1129(b)(2)(A) with respect to this Class, at such other interest rate, as determined by the Bankruptcy Court pursuant to 11 U.S.C. §1129(b)(2)(A)(i)(II), that provides the holder of the Class 2 Claim with deferred cash payments totaling at least the Allowed amount of such Claim, of a value, as of the Effective Date of the Plan, of at least the value of such |

| | |
|---|---|
| | Holder's interest in the estate's interest in the property securing the Class 2 Claim) until paid in full. The Debtor shall repay the New Principal Balance in equal monthly installments of principal and interest calculated based upon a thirty (30) year amortization schedule with such payments to commence thirty (30) days after the occurrence of the Effective Date and to continue thereafter on the same day of each month through the New Maturity Date. The entire remaining New Principal Balance and any unpaid accrued interest then due to the Class 2 Claim holder shall be paid in full by the Debtor on or before the New Maturity Date. The Debtor shall have the right to prepay principal on the New Principal Balance at any time and to pay the entire New Principal Balance of the Class 2 Claim in full at any time prior to the New Maturity Date without penalty. The Holder of the Class 2 Claim shall retain all of its existing liens, privileges and encumbrances in the Debtor's Assets with the same validity, priority and extent that existed on the Petition Date to secure the timely repayment of the Class 2 Claim.<br><br>Estimated percentage recovery: 100% |
| **Class 3 – General Unsecured Claims**<br><br>The total estimate of the Allowed Class 3 Claims is approximately $2,200,736.00.<br><br>Impaired. Entitled to vote. | Except as provided below with respect to the General Unsecured Claim held by 6444 Associates, L.L.C., each holder of an Allowed General Unsecured Claim shall receive a cash payment from the Debtor on the Effective Date equal to fifty (50%) per cent of its Allowed General Unsecured Claim. The remaining balance of each Allowed General Unsecured Claim shall then bear interest from the Effective Date until paid at the rate of 4% per annum. The remaining balance of principal and accrued interest due to each such holder of an Allowed General Unsecured Claim shall then be due and payable by the Debtor as a lump sum payment one year after the occurrence of the Effective Date.<br><br>***Less Favorable Treatment of 6444 Associates, L.L.C. Claim.*** Provided that this Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, by voting in favor of confirmation of this Plan, the holder of the General Unsecured Claim of 6444 Associates, L.L.C., shall be deemed to have consented to the following <u>less</u> favorable treatment of its General Unsecured Claim as Allowed: the holder of the General Unsecured Claim of 6444 Associates, L.L.C. shall <u>not</u> receive any payments by virtue of such claim until (a) all Unclassified Claims have been paid in full and (b) all other Allowed General Unsecured Claims have been paid in full as provided by this Plan and (c) the Debtor is current on all payments to the holder of the Class 2 Claim as required by this Plan. If all of the aforesaid conditions are satisfied and so long as the Debtor remains current in payments to the holder of the Class 2 Claim, the Debtor shall repay the Class 2 Claim in equal monthly installments of principal and interest accruing from the Effective Date at a rate of 4% per annum calculated based upon a thirty (30) year amortization schedule. The entire balance of principal and accrued unpaid interest due to the holder of the General Unsecured Claim of 6444 Associates, L.L.C. shall balloon and become due and payable seventy two (72) months after the occurrence of the Effective Date.<br><br>Estimated percentage recovery: 100% |

The Claims and Claim amounts listed above are amounts estimated by the Debtor as of the filing of this Disclosure Statement and all such Claims are still being reviewed by the Debtor. A listing

of Claims or any amounts with respect thereto above or elsewhere in this Disclosure Statement shall not constitute, or be deemed to constitute, allowance of such Claims and all such Claims and amounts are subject, and will remain subject, to challenge and objection by the Debtor and the Reorganized Debtor prior to voting on the Plan and at any time thereafter as provided in the Plan.

## C. INTERESTS UNDER THE PLAN

The following is a summary of the classification and treatment of Interests under the Plan:

| Class 4 – Equity Interests<br><br>Impaired. Entitled to vote. | Although the Holders of Equity Interests shall retain those interests after confirmation, no distributions may be made to the Holders of such Equity Interests by virtue of same unless the following conditions have been met: (a) all Unclassified Claims have been paid in full; (b) all other Allowed General Unsecured Claims other than the claim of 6444 Associates, L.L.C. have been paid in full as provided by this Plan; and, (c) the Debtor is current on all payments to the holder of the Class 2 Claim and the claim of 6444 Associates, L.L.C. as required by this Plan.<br><br>Estimated percentage recovery: N/A |
|---|---|

## III. GENERAL OVERVIEW AND BACKGROUND INFORMATION

### A. BACKGROUND AND GENERAL INFORMATION

#### 1. OVERVIEW AND BACKGROUND OF THE DEBTOR

The Debtor is the developer and owner of a 280 unit multi-family residential apartment complex commonly known as the Watermarke Apartments (hereinafter referred to as "Watermarke") in metropolitan Houston, Texas located on 15.653 acres. Construction began on Watermarke in 2005 and tenant occupancy began in August of that same year.

#### 2. DEBTOR'S CORPORATE STRUCTURE

The partners of Beltway 8 Associates, Limited Partnership are Beltway 8 Associates, LLC (1%), Nick Saban (49.5%), and Spinosa Class Trust (49.5%).

**B. THE DEBTOR'S MANAGEMENT**

General Partner                                          Limited Partners

Beltway 8 Associates, LLC                    Nick Saban

                                                              Spinosa Class Trust

**C. THE DEBTOR'S DEBT STRUCTURE**

The Debtor's Capital Structure is as follows:

Priority Tax Claims - $510,533

Tenant Deposit Claims - $65,880.00

FST Watermarke - $21,250,300.00 + accrued interest

General Unsecured Claims - $2,200,736.00

**D. EVENTS LEADING TO THE CHAPTER 11 CASE**

On August 21, 2008, Beltway 8 refinanced the then-existing debt by entering into a loan agreement with Compass Bank in the principal amount of $21,250,300.00 (hereinafter, the "Loan"). The Maturity Date occurred on August 21, 2010. At the time of maturity Beltway 8 was current on all required payments and had already been in conversation with Compass bank in good faith towards what Beltway 8 believed was a renewal of the loan.

In the first week of November, Beltway 8 learned that Compass Bank was marketing the Loan for sale through Mission Capital, a company that specializes in selling secured loans to investors. The auction date for this note had already been scheduled for November 15th, 2010, less than 2 weeks from the date upon which we learned that a loan renewal would not be forthcoming.

Upon learning that the Loan was being marketed for sale, Beltway 8 corresponded with Compass Bank in an effort to enforce certain applicable provisions of the Loan Documents disregarded by Compass Bank, including without limitation a requirement that the Loan be offered for sale to the guarantor of the loan prior to any adverse action against Beltway 8. Beltway 8 further corresponded with Compass Bank in an effort to avoid adverse action by submitting its own offer to purchase the Loan.

Despite Beltway's efforts, Beltway 8 alleges that Compass assigned the Loan to FST Watermarke, LLC on December 2, 2010, in violation of Paragraph 15 of the Construction Loan Agreement. Beltway 8 alleges that the relevant provision precludes Compass Bank from assigning the Loan to entities like FST Watermarke and instead mandates that Compass Bank may only assign the Loan to "one or more financial institutions of its choice". Beltway 8 alleges that this provision was specifically designed to protect Beltway 8, as Borrower, from real estate investors that may purchase the loan with the intent of owning the asset, known as a "loan to own" entity, as opposed to a lender looking to buy the note to collect interest from routine monthly payments. On December 8, 2010, less than one week after the Loan was assigned, FST Watermarke, LLC, notified Beltway 8 that a Substitute Trustee would conduct a foreclosure sale on January 4, 2011. This gave Beltway 8 less than 30 days to refinance a $21,250,300 note during a time when the financial markets were still unsettled after the recession and virtually closed for business during the Christmas season. Beltway 8 would have been immediately and irreparably harmed if the foreclosure sale would have occurred, for this reason a chapter 11 filing was unavoidable.

Prior to the filing of the Petition, the Debtor filed a complaint against Compass Bank and FST Watermarke in the Circuit Court of Jefferson County, Alabama, captioned *Beltway 8*

*Associates Limited Partnership v. Compass Bank and FST Watermarke, LLC*, Case #CV-2010-003212 ("Complaint"). Through the Complaint, the Debtor is seeking a judgment declaring the assignment of the Debtor's loan from Compass Bank to FST Watermarke invalid and void. Although the debtor's request for a preliminary injunction in that case was denied, the case is progressing in Alabama.

The Debtor's cash flow problems that resulted in arrearages due to the various taxing authorities in prior years was due to an oversupply issue in the submarket which in turn forced properties to offer major concessions to maintain occupancies. The Steeplechase submarket in which Watermarke is located added over 1,700 units of new construction in 2009 alone, and a total of 5,341 new units since 2006. Over this period of time, the submarket could not absorb the new supply therefore occupancies dropped in the Class A product from 90% in 2005, to a low of 80% in 1st Qtr 2009. The market has made a quick recovery since then and the Steeplechase submarket is now 92.6% occupied as of March 2011. Watermarke is currently outperforming the market at 96% occupancy. (See O'Connor and Associates data attached as Exhibit D-2 for market references.)

Attached to this Disclosure Statement as Exhibit D-3 are monthly financial statements for the Debtor from the Petition Date through February 28, 2011. The statements demonstrate that the Debtor is generating sufficient cash flow to fund the proposed payments under the Plan.

## E. SIGNIFICANT POST-PETITION EVENTS

On January 3, 2011 (the "Petition Date"), Beltway filed for relief under Chapter 11 of the Bankruptcy Code. The Debtor continues to operate its business and manage its properties as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**1. CONTINUATION OF BUSINESS; STAY OF LITIGATION.**

Following the Petition Date, the Debtor has continued to operate as debtor-in-possession with the protection of the Bankruptcy Court. The Bankruptcy Court has certain supervisory powers over the Debtor's operations during the pendency of the Chapter 11 Case, including the power to approve any transactions that are outside the ordinary course of the Debtor's business. An immediate effect of the filing of a bankruptcy case is the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all litigation against the Debtor. This injunction will remain in effect until the Effective Date unless modified or lifted by order of the Bankruptcy Court.

Since the filing of the bankruptcy case, the Debtor has paid a total of $458,682.70 to Don Sumners Tax Assessor, Cypress Fairbanks ISD, and West Harris County MUD #11, taxing authorities that collectively held priority tax claims of approximately $970,000.00 as of the Petition Date.

The financial outlook for the Debtor is very bright, as the Houston market is now considered the 5th best apartment market in the country (see Exhibit D-4) and has the 12th best employment expansion nationwide. Watermarke's submarket Steeplechase is poised for continued increases in both occupancy and rental rates over the next two years due to the fact that no new supply will be entering the market for quite some time. The Steeplechase submarket only added 254 units in 2010, and has no Class A units under construction currently as of April 2011. This means that Watermarke and the entire Steeplechase submarket will able to operate for at least the next 2 years without having to offer substantial concessions to compete with the oversupply that has plagued this area for the last several years. By allowing a 5 year extension of the loan as sought under the Debtor's Plan, Watermarke will have time to completely remove

concessions from the market and achieve substantially higher rental rates. During that time, the property will have achieved a sufficient stabilized net operating income that will be able to obtain adequate refinance proceeds to pay off our obligation to FST Watermarke.

**2. FIRST DAY PLEADINGS**

Following the filing of the petition, the Debtor filed, among other pleadings, the following "first day pleadings" with the Bankruptcy Court:

a.        Application to Employ Counsel [P-5];

b.        Emergency Motion for Order Authorizing the Debtor to Use Cash Collateral and Scheduling a Final Hearing Pursuant to Federal Rule of Bankruptcy Procedure 4001 [P-6]; and,

c.        Motion for Authority to Pay Employees' Pre-Petition Wages and Benefits [P-8]

**3. COMPLIANCE WITH BANKRUPTCY CODE, BANKRUPTCY RULES, LOCAL COURT RULES, AND U.S. TRUSTEE DEADLINES.**

On January 25, 2011, the Debtor filed its Statement of Financial Affairs, Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Lists of Equity Security Holders. Pursuant to section 341 of the Bankruptcy Code, a meeting of creditors for the Debtor was held on January 28, 2011.

## IV. THE PLAN

The Debtor has proposed the Plan and believes that the classification and treatment of Claims and Membership Interests provided for in the Plan are consistent with the requirements of the Bankruptcy Code. Under the Bankruptcy Code, holders of Allowed Claims against and Membership Interests in the Debtor that are Impaired and that receive distributions under the Plan are entitled to vote on the Plan. A copy of the Plan accompanies this Disclosure Statement as **Exhibit D-1.** A summary of the classification and treatment of Claims and Interests under the Plan is set forth above in this Disclosure Statement.

The interest rates for the creditors set forth in the Plan are based upon the non-default contract rate of the Debtor's loan to FST Watermarke. The non-default contract rate of the FST Watermarke loan is a current market rate for a multi-family housing loan,

## A. VALUATION OF THE DEBTOR

The Debtor's lone asset is its apartment complex in Houston, Texas, which the Debtor has valued at $25,000,000.00. This value was determined by calculating net operating income in place for the previous period and applying a cap rate of 6.25% as a conservative number for valuation purposes. The likely range of cap rates in today's market for facilities such as Watermarke is 6% to 6.25%. Those rates would give a current value range of $25,200,000 to $26,250,000.

The 25,000,000 value was formulated by Joseph T. Spinosa, manager of the Debtor, based on his experience as an owner of Multi-Family properties for the last 30 years. Since 1979, Mr. Spinosa has been President and Chief Executive Officer of JTS Interests. He is responsible for real estate investments, development and property management operations, and has acquired or developed commercial and residential real property valued in excess of $1.0 billion. The valuation is also based on Mr. Spinosa's knowledge of the Houston sub-market in which this property is located along with its historical and anticipated streams of revenue. Both the historical and going forward economics easily support the 25M valuation. Furthermore, the local sub-market continues to improve showing monthly increases in cash flow further contributing to the conservative estimate of value.

## B. TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN

The Plan provides for the payment of Claims against the Debtor, including the treatment of unclassified Claims. The principal Administrative Claims known to the Debtor are the fees

and expenses of the Debtor's attorneys, Steffes, Vingiello & McKenzie, LLC and Fleenor, Green & McKinney. As of March 31, 2011, those fees and expenses are approximately $45,000.00. Additional fees and expenses will continue to be incurred through the Effective Date of the Plan.

**1. ADMINISTRATIVE CLAIMS.**

A. ADMINISTRATIVE EXPENSE CLAIMS. On the later of (i) the Effective Date or (ii) the date on which an Administrative Expense Claim becomes Allowed, the Reorganized Debtor shall either (a) pay to each Holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim, or (b) satisfy and discharge such Administrative Expense Claim in accordance with such other terms that the Reorganized Debtor and such Holder shall have agreed upon in writing; *provided, however,* that such agreed-upon treatment shall not be more favorable than the treatment provided in subsection (a).

B. BAR DATE FOR FILING ADMINISTRATIVE EXPENSE CLAIMS. Requests for payment of Administrative Expense Claims and hearing notices related thereto shall be Filed and properly served in accordance with the local rules of the Bankruptcy Court no later than thirty (30) days after the Effective Date. Such request shall include at a minimum (a) the name of the Holder of the Administrative Expense Claim, (b) the amount of the Administrative Expense Claim and (c) the basis for the Administrative Expense Claim. Failure to file and serve such request and related notice(s) timely and properly shall result in the Administrative Expense Claim being forever barred and discharged.

C. PROFESSIONAL COMPENSATION CLAIMS. All professionals or other entities requesting compensation or reimbursement of expenses under sections 327, 328, 330, 331, 333, 503(b), 506 and 1103 of the Bankruptcy Code for services rendered before the Effective Date (including any compensation requested by any professional for any other entity for making a substantial contri-

bution in the Reorganization Case) shall File and serve on the Reorganized Debtor an application for final allowance of compensation and reimbursement of expenses no later than thirty (30) days after the Effective Date.

D. ORDINARY COURSE LIABILITIES. Holders of Administrative Expense Claims based on unpaid and undisputed amounts due by the Debtor in Possession for goods and services provided to it after the Petition Date and before the Effective Date arising in the ordinary course of the Debtor's business shall not be required to file any request for payment of such Claims but each shall be deemed to be an Allowed Administrative Expense Claim in the undisputed amount recognized by the Debtor in Possession. Such deemed Allowed Administrative Expense Claims shall be paid in the ordinary course of business by the Reorganized Debtor without any further action by the Holders of such Claims.

**2. PRIORITY TAX CLAIMS.**

Except to the extent that the Reorganized Debtor and a Holder of an Allowed Priority Tax Claim against the Debtor agree to a different treatment, each Holder of an Allowed Priority Tax Claim against the Debtor shall receive, at the sole option of the Reorganized Debtor, (a) on the Effective Date, Cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim, or (b) commencing 45 days after the occurrence of the Effective Date and continuing over a period not exceeding five (5) years from and after the Order For Relief Date, equal quarterly Cash payments in an aggregate amount equal to the unpaid portion of such Allowed Priority Tax Claim, together with interest at the applicable rate under nonbankruptcy law, subject to the sole option of the Reorganized Debtor, as applicable, to prepay the entire amount of the unpaid portion of Allowed Priority Tax Claim and in a manner not less favorable than the most favored nonpriority unsecured Claim provided for by the Plan. All Allowed Priority Tax Claims that are

not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due. Any Priority Tax Claim secured by a lien shall retain such lien to secure its claim until paid in full.

## C. TREATMENT OF CLASSIFIED CLAIMS UNDER THE PLAN

### Class 1 – Tenant Deposit Claims.

*Impairment and Voting.* Class 1 is unimpaired by this Plan. Each Holder of a Tenant Deposit Claim is deemed to have accepted this Plan.

*Treatment.* Each Holder of an Allowed Tenant Deposit Claim shall retain its legal, equitable, and contractual rights to which it may be entitled under state law.

### Class 2 – FST Watermarke, LLC Secured Claim.

*Impairment and Voting.* Class 2 is impaired by this Plan. The Holder of the Class 2 Claim is entitled to vote to accept or reject this Plan.

*Treatment.* On the Effective Date, all accrued unpaid interest calculated at the non-default contractual rate of 4% per annum (or at such other rate as the bankruptcy court determines to be appropriate) plus any amounts Allowed by the bankruptcy Court pursuant to 11 U.S.C. § 506(b) shall be capitalized and added to the outstanding principal balance of $21,250,000.00 due under the FST Watermarke Note ("the New Principal Balance"). As permitted under 11 U.S.C. § 1123(a)(5)(H), the maturity of the FST Watermarke Note shall be extended to sixty (60) months from the Effective Date ("the New Maturity Date"). The Debtor shall then repay the New Principal Balance with interest accruing at the non-default contractual rate of 200 basis points (2.0%) in excess of LIBOR (as defined in the FST Watermarke Note) provided that the applicable Rate of interest shall be not less than 4% per annum from the Effective Date (or if the Plan is confirmed pursuant to 11 U.S.C. §1129(b)(2)(A) with respect to this Class, at such other

interest rate, as determined by the Bankruptcy Court pursuant to 11 U.S.C. §1129(b)(2)(A)(i)(II), that provides the holder of the Class 2 Claim with deferred cash payments totaling at least the Allowed amount of such Claim, of a value, as of the Effective Date of the Plan, of at least the value of such Holder's interest in the estate's interest in the property securing the Class 2 Claim) until paid in full. The Debtor shall repay the New Principal Balance in equal monthly installments of principal and interest calculated based upon a thirty (30) year amortization schedule with such payments to commence thirty (30) days after the occurrence of the Effective Date and to continue thereafter on the same day of each month through the New Maturity Date. The entire remaining New Principal Balance and any unpaid accrued interest then due to the Class 2 Claim holder shall be paid in full by the Debtor on or before the New Maturity Date. The Debtor shall have the right to prepay principal on the New Principal Balance at any time and to pay the entire New Principal Balance of the Class 2 Claim in full at any time prior to the New Maturity Date without penalty. The Holder of the Class 2 Claim shall retain all of its existing liens, privileges and encumbrances in the Debtor's Assets with the same validity, priority and extent that existed on the Petition Date to secure the timely repayment of the Class 2 Claim.

**Class 3 – General Unsecured Claims.**

*Impairment and Voting.* General Unsecured Claims are impaired by this Plan. Each Holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject this Plan.

*Treatment.* Except as provided below with respect to the General Unsecured Claim held by 6444 Associates, L.L.C., each holder of an Allowed General Unsecured Claim shall receive a cash payment from the Debtor on the Effective Date equal to fifty (50%) per cent of its Allowed General Unsecured Claim. The remaining balance of each Allowed General Unsecured Claim shall then bear interest from the Effective Date until paid at the rate of 4% per annum. The

remaining balance of principal and accrued interest due to each such holder of an Allowed General Unsecured Claim shall then be due and payable by the Debtor as a lump sum payment one year after the occurrence of the Effective Date.

*Less Favorable Treatment of 6444 Associates, L.L.C. Claim.* Provided that this Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, by voting in favor of confirmation of this Plan, the holder of the General Unsecured Claim of 6444 Associates, L.L.C., shall be deemed to have consented to the following <u>less</u> favorable treatment of its General Unsecured Claim as Allowed: the holder of the General Unsecured Claim of 6444 Associates, L.L.C. shall <u>not</u> receive any payments by virtue of such claim until (a) all Unclassified Claims have been paid in full and (b) all other Allowed General Unsecured Claims have been paid in full as provided by this Plan and (c) the Debtor is current on all payments to the holder of the Class 2 Claim as required by this Plan. If all of the aforesaid conditions are satisfied and so long as the Debtor remains current in payments to the holder of the Class 2 Claim, the Debtor shall repay the Class 2 Claim in equal monthly installments of principal and interest accruing from the Effective Date at a rate of 4% per annum calculated based upon a thirty (30) year amortization schedule. The entire balance of principal and accrued unpaid interest due to the holder of the General Unsecured Claim of 6444 Associates, L.L.C. shall balloon and become due and payable seventy two (72) months after the occurrence of the Effective Date.

**D. TREATMENT OF CLASSIFIED INTERESTS UNDER THE PLAN**

**Class 4 – Equity Interests.**

*Impairment and Voting.* Class 4 is impaired by this Plan. Each Holder of an Allowed Equity Interest is entitled to vote to accept or reject this Plan.

*Treatment.* Although the Holders of Equity Interests shall retain those interests after confirmation, no distributions may be made to the Holders of such Equity Interests by virtue of same unless the following conditions have been met: (a) all Unclassified Claims have been paid in full; (b) all other Allowed General Unsecured Claims other than the claim of 6444 Associates, L.L.C. have been paid in full as provided by this Plan; and, (c) the Debtor is current on all payments to the holder of the Class 2 Claim and the claim of 6444 Associates, L.L.C. as required by this Plan.

### E. MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN

#### 1. EFFECTIVE DATE.

The "Effective Date" of the Plan shall be the date specified by the Debtor in a notice filed with the Bankruptcy Court as the date on which the Plan shall take effect, and which occurs after (i) the Confirmation Order becomes a Final Order; and (ii) the condition precedent to the Effective Date provided for in Article XI of the Plan has been satisfied.

#### 2. EFFECTIVE DATE CONDITIONS.

(1)     The Confirmation Order, in form and substance satisfactory to the Debtor shall have become a Final Order.

(2)     The Debtor shall have sufficient cash on hand with which to make all payments required to be made on the Effective Date.

*Effect of Failure of Conditions.* In the event that the conditions specified in Article 10.1 of the Plan have not been satisfied on or before 30 days after the Confirmation Date, then without an order of the Bankruptcy Court: (a) this Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for hereby shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtor may assume and assign

or reject all executory contracts and unexpired leases shall be extended for a period of sixty (60) days after such date.

### 3. MEANS TO IMPLEMENT THE PLAN.

The Reorganized Debtor shall act as Disbursing Agent under the Plan and make all distributions required under the Plan.

### F. OBJECTIONS TO CLAIMS/ADMINISTRATIVE CLAIMS/INTERESTS

### 1. OBJECTIONS TO CLAIMS OR INTERESTS; PROSECUTION OF DISPUTED CLAIMS OR DISPUTED INTERESTS.

The Debtor and the Reorganized Debtor have the responsibility and authority for administering, disputing, objecting to, compromising and settling or otherwise resolving and finalizing Distributions (if any) with respect to all Claims.

### 2. ESTIMATION OF DISPUTED CLAIMS.

The Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor has previously objected to such Claim.

### 3. NO DISTRIBUTION ON ACCOUNT OF DISPUTED CLAIMS.

If a Claim or any portion of a Claim is disputed, no payment or Distribution shall be made on account of the disputed portion of such Claim (or the entire Claim, if the entire Claim is disputed), unless such Disputed Claim or portion thereof becomes an Allowed Claim.

### G. CLAIMS AGAINST OTHERS

The Reorganized Debtor shall retain and may enforce, and shall have the sole right to enforce, any claims, demands, rights and Causes of Action that the Debtor or its Estate may hold against any Entity. The Reorganized Debtor or its successor may pursue such retained claims,

demands, rights or Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor, or its successor. Further, the Reorganized Debtor, as the case may be, retain their rights to file and pursue, and shall have the sole right to file and pursue any adversary proceedings against any account debtor related to debt balances or deposits owed to any Debtor. Notwithstanding the above, the Debtor does not intend to bring any Avoidance Actions after entry of the Confirmation Order.

## H. EXECUTION OF DOCUMENTS AND PARTNERSHIP ACTION

The Debtor's General Partner is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures and other agreements or documents, and to take such actions as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of this Plan and the debt and equity securities issued pursuant to this Plan.

## V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A. ASSUMPTION

According to the Debtor's Schedules, the Debtor is a party to an executory contract with JTS Management Company, LLC. Through that contract, JTS Management Company, LLC provides financial and property management services to the Debtor. The Debtor is also a party to rental agreements with tenants of the Debtor. Except as otherwise provided herein or pursuant to the Confirmation Order, as of the Effective Date, the aforementioned executory contracts and any other unexpired leases between the Debtor and any Person shall be assumed pursuant to section 365(a) of the Bankruptcy Code, except for any executory contract or unexpired lease that has been assigned or rejected or renegotiated and either assumed or rejected on renegotiated terms, pursuant to an order of the Bankruptcy Court entered prior to the Effective Date. Entry of

the Confirmation Order shall constitute approval, pursuant to section 365(a) of the Bankruptcy Code, of the assumption of executory contracts and unexpired leases provided for herein.

## B. REJECTION

If the rejection of an executory contract or unexpired lease by the Debtor (pursuant to this Plan or otherwise) results in a Claim, then such Claim shall be forever barred and shall not be enforceable against the Debtor and the Reorganized Debtor unless a Proof of Claim is filed and served upon counsel for the Debtor no later than thirty (30) days after the earlier of (i) entry of the Confirmation Order, or (ii) entry of an order approving such rejection. Unless otherwise ordered by the Bankruptcy Court, all Claims arising from the rejection of executory contracts and unexpired leases shall be treated, to the extent they are Allowed Claims, as Allowed Class 3 Claims.

## C. CURE PAYMENTS, COMPENSATION FOR PECUNIARY LOSS, AND ADEQUATE ASSURANCE

On the Effective Date, the Reorganized Debtor (a) shall cure or provide adequate assurance that it shall cure any and all undisputed defaults under any Assumed Contract, and (b) compensate or provide adequate assurance that it shall promptly compensate the other parties to such executory contract or unexpired lease for the agreed amount of any actual pecuniary loss to such party resulting from such undisputed default in accordance with section 365(b)(1) of the Bankruptcy Code. In the event that the Reorganized Debtor disputes the existence of a default, or the nature, extent or amount of any required cure, adequate assurance or compensation, the obligations of the Reorganized Debtor under section 365(b) of the Bankruptcy Code shall be determined at the Confirmation Hearing or at any other hearing ordered by the Bankruptcy Court, and any such obligations shall be performed by the Reorganized Debtor within thirty days

after the Effective Date unless otherwise provided in the Confirmation Order or by other order of the Bankruptcy Court.

## VI.  POST-CONFIRMATION MANAGEMENT AND COMPENSATION

The Debtor will continue to operate its property in Texas after the Effective Date of the Plan.  Management of the Debtor will remain the same.  At this time, no general or limited partners, or persons related to any general or limited partners of the Debtor receive a salary from the Debtor.  The Debtor does not foresee any general or limited partners, or persons related to any officers or directors of the Debtor receiving a salary from the Debtor in the near future.

## VII.  LITIGATION

### A. PENDING LAWSUITS

1.      *Beltway 8 Associates Limited Partnership v. Compass Bank and FST Watermarke, LLC*, Circuit Court of Jefferson County, Alabama, Case #CV-2010-003212.  In this case, the Debtor is seeking a judgment declaring the assignment of the Debtor's loan from Compass Bank to FST Watermarke invalid and void.  Although the debtor's request for a preliminary injunction in that case was denied, the case is progressing in Alabama.  If the Debtor is successful in this case, it would not generate any revenues for the estate.

### B. POTENTIAL ACTIONS

1.      POTENTIAL AVOIDANCE ACTIONS

The Debtor has begun investigating payments made by the Debtor prior to the filing of the case to determine if any avoidable transfers were made.  While the Debtor is not aware of any claims or causes of action in favor of the Debtor, all claims and causes of action in favor of the Debtor, including, without limitation, all claims under Sections 544, 548, and 549, 550, 551, 553 and 554 of the Bankruptcy Code, are reserved and may be prosecuted after the Effective

Date by the Reorganized Debtor. At present, the debtor has made no such demands nor commenced such litigation and has no intention of doing so prior to confirmation.

## VIII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and certain U.S. holders of Claims and Interests. The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. No assurance can be given that legislative or administrative changes or court decisions may not be forthcoming which would require significant modification of the statements expressed in this section. Certain tax aspects of the Plan are uncertain due to the lack of applicable regulations and other tax precedent. The Debtor has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt.

TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND ANY INTERESTS ARE HEREBY NOTIFIED THAT (a) ANY DISCUSSION OF TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE TAX CODE, AND (b) THIS DISCUSSION WAS WRITTEN IN CONNECTION WITH THE PROMOTION OF THE PLAN.

THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, ALL HOLDERS SHOULD CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

The Debtor is a conduit entity and, as such, pays no taxes. The plan treatment of the Debtor's assets generates a potential tax event for the equity holders of the Debtor. The tax event can be a gain or loss depending on the equity owner's basis in the partnership and the gain or loss can either be a capital gain or ordinary income depending on the individual's treatment of the investment in the Debtor. Because the Debtor's Plan is a full pay plan that will not discharge or reduce any of its indebtedness, it does not appear that confirmation of the Plan will result in any adverse tax consequences to the holders of equity interests.

## IX. LIQUIDATION ANALYSIS UNDER CHAPTER 7

Under the Bankruptcy Code, in order for a plan to be confirmed, each creditor must receive or retain under the Plan a recovery that has a value at least equal to the value of the distribution that such creditor would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

The following Chapter 7 liquidation analysis ("Analysis") presents the estimated net value of the Assets of the Debtor, assuming that the Debtor is liquidated under the provisions of Chapter 7 of the United States Bankruptcy Code, and that the net proceeds from the liquidation of the Debtor are applied among the creditors of the Debtor's estate. The Analysis indicates the estimated values that might be obtained by classes of claims if the Debtor's assets were liquidated pursuant to a Chapter 7 liquidation, as an alternative to the Plan. Based on this

Analysis, a liquidation under Chapter 7 would produce less value for distribution to creditors than that recoverable under the Plan.

Underlying the Analysis is a number of estimates and assumptions that are inherently subject to significant uncertainties and contingencies beyond the control of the Debtor or a Chapter 7 trustee. Therefore, there can be no assurance that the assumptions and estimates employed in determining the liquidation value of the Debtor's assets will result in an accurate estimate of the proceeds that would be realized should the Debtor undergo actual liquidation. The actual amounts of claims against the estates could vary significantly from each of the Debtor's estimates depending on the claims asserted during the pendency of the bankruptcy proceedings and the outcomes of the Debtor's claims objections. The Analysis does not include the effect of any federal or state income tax liabilities that may arise as a result of the conversion of the case, if any. The Analysis also does not include liabilities that may arise as a result of lease or contract rejections, litigation, real estate or ad valorem tax assessments, or other potential claims unless expressly disclosed herein.

The Debtor's sole asset is the real property in metropolitan Houston, Texas, which has a fair market value of $25,000,000. That asset is secured by tax claims of Don Sumners Tax Assessor, Cypress Fairbanks ISD, and West Harris County MUD #11 ($510,533), and the secured claim of FST Watermarke ($21,250,300). ("Secured Collateral"). Since it is probable that a sale of the Secured Collateral through Chapter 7 would result in a price below fair market value, the most likely result in a Chapter 7 liquidation is that either one of the secured creditors would foreclose on their collateral, according to the respective rank of the creditors,[1] or a sale would generate funds for a minimal distribution to unsecured creditors. As a consequence, the

---

[1] This statement does not purport to establish or state the rank of secured creditors in relation to their respective collateral.

Secured Collateral would be stripped away as assets of the Chapter 7 bankruptcy estate. Since the Debtor has no other property, there would be no remaining assets to liquidate to distribute to administrative and priority creditors. If the Debtor's property were abandoned by the Chapter 7 Trustee and foreclosed upon, there would not be any funds available for distribution to unsecured creditors. In the event of a sale of the property by the Chapter 7 Trustee, all outstanding administrative and priority claims must be paid in a Chapter 7 liquidation before any distribution to Unsecured Creditors. The administrative claims consist of the fees and expenses due to the Debtor's Chapter 11 professionals (estimated at $30,000.00), the fees and expenses of the Chapter 7 Trustee (est. $40,250.00), and the fees and expenses of a realtor (estimated at 1% of sale price).

A chart reflecting the hypothetical distribution in a Chapter 7 case based on a sale of $20,000,000.00, which is eighty percent (80%) of fair market value, is set forth below:

HYPOTHETICAL DISTRIBUTION UNDER CHAPTER 7

| | Claims | Estimated Distribution | Balance |
|---|---|---|---|
| ASSETS | | | |
| Real Estate | | | $20,000,000 |
| | | | |
| LESS | | | $20,000,000 |
| Secured Tax Claims | $510,533 | ($510,533) | $19,489,467 |
| FST Watermarke | $21,250,300 | ($19,489,467) | $1,760,833 |
| Chapter 7 Fees | $0 | $0 | $0 |
| Realtor Fees | $200,000 | $0 | $0 |
| Chapter 11 Administrative Fees | $30,000 | $0 | $0 |
| Priority Claims | $65,880 | $0 | $0 |
| Unsecured Claims | $2,200,736 | $0 | $0 |

Pursuant to the Debtor's liquidation analysis, even at a sale of $20,000,000, or eighty percent (80%) of fair market value, the recoveries under a Chapter 7 liquidation scenario would

be significantly lower than that proposed by the Plan for a variety of reasons. First, the sale of the Debtor's primary asset under a compressed timeframe and the distressed nature of a Chapter 7 liquidation will most likely result in a lower sale price than true fair market value of the property. Second, the conversion of the case to Chapter 7 liquidation would necessitate the payment of fees to the Chapter 7 Trustee, and possibly attorneys, realtors, accountants and other professionals retained by the Chapter 7 Trustee, for disposition of the assets. These fees directly reduce any recovery otherwise available to creditors and/or the holders of Equity Interests, and would result in no distribution to priority or unsecured creditors. Accordingly, each holder of a Claim will receive or retain under the Plan a recovery that has a value at least equal to the value of the distribution that such creditor would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

## X. CONFIRMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### A. VOTING AND OTHER PROCEDURES

A Ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of Claims that are entitled to vote to accept or reject the Plan. Each holder of a Claim or interest in Classes 2, 3 and 4 shall be entitled to vote to accept or reject the Plan. Pursuant to the provisions of the Bankruptcy Code, only holders of claims or interests in classes that are impaired under the terms and provisions of a chapter 11 plan and are to receive distributions thereunder are entitled to vote to accept or reject the plan. Classes of claims or interests in which the holders of claims and interests will not receive or retain any property under a chapter 11 plan are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan. Classes of claims or interests in which the holders of claims or interests are

Unimpaired under a Chapter 11 plan, such as Class 1, are deemed to have accepted the plan and also are not entitled to vote to accept or reject the plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of: (i) Claims, as acceptance by creditors actually voting in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims; and (ii) Interests, as acceptance by interest holders in that class actually voting that hold at least two-thirds in number of ownership shares of the common stock of a debtor.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or otherwise in accordance with the provisions of the Bankruptcy Code.

With respect to the Plan, any holder of a Claim in an Impaired Class (i) whose Claim has been listed by the Debtor in the Schedules filed with the Bankruptcy Court (provided that such Claim has not been scheduled as disputed, contingent or unliquidated), or (ii) who filed a proof of claim on or before the applicable bar date (or, if not filed by such date, any proof of claim filed within any other applicable period of limitations or with leave of the Bankruptcy Court), which Claim has not been disallowed and is not the subject of an objection, is entitled to vote. Holders of Claims that are disputed, contingent and/or unliquidated are entitled to vote their Claims only to the extent that such Claims are Allowed for the purpose of voting pursuant to an order of the Bankruptcy Court. The Debtor may seek a determination that any Class of Claims that is entitled to vote to accept or reject the Debtor's Plan that does not vote to accept or reject the Debtor's Plan be deemed to accept the Plan, as applicable.

After carefully reviewing this Disclosure Statement, including any exhibits, each holder

of an Allowed Claim or Equity Interest entitled to vote may vote whether to accept or reject the Debtor's Plan. A Ballot for voting on the Plan accompanies this Disclosure Statement. If you hold a Claim or Equity Interest in more than one Class and you are entitled to vote Claims in more than one Class, you may receive a Ballot or Ballots, which will permit you to vote in all appropriate Classes of Claims. Please vote and return your Ballot to Steffes, Vingiello & McKenzie, LLC as follows, whether by U.S. mail, or by hand delivery or courier service:

**Steffes, Vingiello & McKenzie, LLC**
**Attention: Patrick S. Garrity**
**13702 Coursey Boulevard, Bldg.3**
**Baton Rouge, Louisiana 70817**

ANY EXECUTED BALLOT THAT FAILS TO INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED. BALLOTS RETURNED TO STEFFES, VINGIELLO & MCKENZIE, LLC BY FACSIMILE TRANSMISSION OR ANY OTHER ELECTRONIC MEANS WILL NOT BE COUNTED.

**THE VOTING DEADLINE IS 5:00 P.M., CENTRAL TIME ZONE, ON _____ __, 2011.**

APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN. ALL CREDITORS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

**Ballots must be *received* by Steffes, Vingiello & McKenzie, LLC by the Voting Deadline.** If a Ballot is received after the Voting Deadline, it will not be counted. Complete the Ballot by providing all the information requested, and sign, date and return the Ballot by mail,

overnight courier or personal delivery to Steffes, Vingiello & McKenzie, LLC at the address set forth above.

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN THE TIME AND DATE SET FORTH IN THE ACCOMPANYING NOTICE. ANY OBJECTIONS TO THE CONFIRMATION OF THE PLAN MUST BE FILED IN ACCORDANCE WITH AND NO LATER THAN THE TIME AND DATE SET FORTH IN THE ACCOMPANYING NOTICE.

If you are entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please telephone the Patrick S. Garrity at the following telephone number: **1-225-751-1751**.

**B. DISCLAIMERS AND ENDORSEMENTS**

This Disclosure Statement contains information about the Debtor's Plan. Holders of Claims and Membership Interests are urged to study the text of the Plan carefully to determine the impact of the Plan on their Claims or Membership Interests and to consult with their financial, tax and legal advisors.

Nothing contained in this Disclosure Statement or the Plan will be deemed an admission or statement against interest that can be used against the Debtor in any pending or future litigation. Any reference to creditors or Claims or Membership Interests in this Disclosure Statement is not an admission with respect to the existence, ownership, validity, priority, or extent of any alleged Lien, Claim, Equity Interest or encumbrance.

Certain statements and assertions in this Disclosure Statement may be subject to dispute by parties in interest.

## C. THE CONFIRMATION HEARING

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing with respect to the Plan. The Confirmation Hearing in respect of the Plan has been scheduled for the date and time set forth in the accompanying notice before the Honorable **Douglas D. Dodd**, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Middle District of Louisiana, on _____ __, 2011. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice other than an announcement of the adjourned date made at the Confirmation Hearing or posted at the courthouse at the Confirmation Hearing or at an adjournment thereof. Any objection to confirmation (i) must be made in writing, (ii) must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or a description of the interest in the Debtor held by the objector, and (iii) must be timely made. Any such objections must be filed with the Bankruptcy Court and served so that they are received by the Bankruptcy Court, and the following counsel, on or before the date and time set forth in the accompanying notice:

**Counsel to the Debtor**:

Steffes, Vingiello & McKenzie, LLC
William E. Steffes, #12426
Patrick S. Garrity, #23477
13702 Coursey Boulevard, Bldg.3
Baton Rouge, Louisiana 70817
Telephone: (225) 751-1751
Facsimile: (225) 751-1998

## D. CONFIRMATION

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan if the requirements of Section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a plan are that the plan is (i) accepted by all Impaired Classes of Claims or, if

rejected by an Impaired Class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) feasible, and (iii) in the "best interests" of creditors that are Impaired under the Plan.

## E. UNFAIR DISCRIMINATION AND FAIR AND EQUITABLE TESTS

Under the Bankruptcy Code, a plan does not have to be accepted by every class of creditors or interest holders to be confirmed. If a class of claims or interests rejects a plan or is deemed to reject a plan, the plan proponent has the right to request confirmation of the plan pursuant to Section 1129(b) of the Bankruptcy Code the so-called "cramdown" provision of the Bankruptcy Code. Section 1129(b) permits the confirmation of a plan notwithstanding the non-acceptance of such plan by one or more impaired classes of claims and interests. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class, and meets the other legal criteria for confirmation.

In the event that any Class of Claims or Interests fails to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code, the Debtor (a) requests that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code.

Accordingly, to obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Impaired, non-accepting Class. The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." The Bankruptcy Code establishes "cram down" tests for Classes of Secured Claims, unsecured Claims and Interests that do not accept the plan, as follows:

1. Secured Creditors

Either (a) each Impaired secured creditor retains the Liens securing its Secured Claim and receives on account of its Secured Claim deferred cash payments (x) totaling at least the Allowed Amount of the Secured Claim and (y) having a present value at least equal to the value of the secured creditor's collateral, (b) each Impaired secured creditor realizes the "indubitable equivalent" of its Allowed Secured Claim, or (c) the property securing the Claim is sold free and clear of Liens with the secured creditor's Lien to attach to the proceeds of the sale and such Lien on proceeds is treated in accordance with clause (a) or (b) of this subparagraph.

## 2. Unsecured Creditors

Either (a) each Impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its Allowed Claim, or (b) the holders of Claims and Interests that are junior to the Claims of the dissenting Class will not receive any property under the plan, and the "best interest" test is met so that each Impaired unsecured creditor recovers at least what that creditor would receive if the case was converted to a chapter 7 case.

## 3. Holders of Interests

Either (a) each holder of Impaired Interests receives or retains under the plan property of a value equal to the greatest of the Allowed Amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest, or (b) no holder of junior interests receives or retains any property, and the "best interest" test is met, so that each Impaired Membership Interest holder recovers at least what that Equity Interest holder would receive if the case was converted to a chapter 7 case.

## 4. No Unfair Discrimination

In addition, the "cram down" standards of the Bankruptcy Code prohibit "unfair discrimination" with respect to the claims of any impaired, non-accepting class. While the

"unfair discrimination" determination depends upon the particular facts of a case and the nature of the claims at issue, in general, courts have interpreted the standard to mean that the impaired, non-accepting class must receive treatment under a plan of reorganization which allocates value to such class in a manner that is consistent with the treatment given to other classes with claims against the debtor of equal or junior status.

All Classes of creditors will receive distributions under the Plan; thus, no Class of creditors is conclusively presumed to have rejected the Plan. The Debtor believes that the treatment of all Classes of Claims and Interests under the Plan satisfies the "no unfair discrimination" requirement for nonconsensual confirmation of the Plan under section 1129(b) of the Bankruptcy Code. With respect to each such Impaired, non-accepting Class, there is no Class of equal priority receiving more favorable treatment under the Plan, and no Class that is junior to such Impaired, non-accepting Class will receive or retain any property under the Plan on account of the Claims or Interests in such Class.

## F. FEASIBILITY

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization unless the liquidation of the debtor is provided for in the plan. It is not likely that the confirmation will be followed by liquidation or the need for further financial reorganization of the Debtor. Financial projections demonstrating the pro forma financial results of the Reorganized Debtor are attached as Exhibit D-3.

## G. BEST INTEREST TEST

In order to confirm a plan of reorganization, the Bankruptcy Court must determine that the plan is in the best interests of all classes of creditors and equity security holders impaired under that plan. The "best interest" test requires that the Bankruptcy Court find that the plan

provides to each member of each impaired class of claims and interests (unless each such member has accepted the plan) a recovery which has a value at least equal to the value of the distribution that each creditor or interest holder would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

All Classes of creditors will receive distributions under the Plan; thus, no Class of creditors is conclusively presumed to have rejected the Plan. The Debtor requests confirmation of the Plan over the rejection of any Classes. In so doing, the Debtor seeks to establish that the Plan complies with the best interest of creditors test with respect to any such Class or Classes, and satisfy all other legal criteria for confirmation.

As reflected in the discussion above, and as demonstrated in the Liquidation Analysis contained in this Disclosure Statement, the Debtor believes that the Plan provides to each holder of a Claim and Interest holder a value at least equal to the value of the distribution that each holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

## H. CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN (AND ANY DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND THE IMPLEMENTATION OF THE PLAN.

The major risk factor is that the Debtor will be unable to achieve the projections set forth in the Plan and make the payments required by the Plan. This can occur in the event of an

unforeseen downturn in the rental market in Houston causing a reduction in projected occupancy or rental rates.

## I. CERTAIN BANKRUPTCY CONSIDERATIONS

### 1. RISK OF LIQUIDATION OF THE DEBTOR'S ESTATE

If the Plan is not confirmed and consummated, there can be no assurance that the Debtor's Chapter 11 Case will continue as chapter 11 reorganization case rather than be converted to liquidation, or that any alternative plan of reorganization would be on terms as favorable or more favorable to holders of Claims and Equity Interests as the terms of the Plan. If a liquidation or different reorganization were to occur, the distributions to certain holders of Allowed Claims may be reduced, or possibly completely eliminated. As previously noted, the Debtor believes that in a liquidation under chapter 7, only the secured Priority Tax Claims and FST Watermarke are likely to receive any distributions. In addition, certain additional Claims may arise in a Chapter 7 liquidation and from the rejection of unexpired leases and other executory contracts in connection with any cessation of the Debtor's operations. As described above, this might negatively impact the amount of distributions under the Plan, if any, to holders of Allowed Claims or Allowed Equity Interests. As a result of these circumstances, the Debtor believes that the Plan provides a significantly higher return to holders of Claims and Equity Interests in the Debtor, as compared to liquidation.

### 2. RISK OF NON-OCCURRENCE OF THE EFFECTIVE DATE

The occurrence of the Effective Date in the Plan is conditioned upon the happening of certain events. There can be no assurance that all of these events will occur or that those that do not occur will be waived. Accordingly, even if the Plan is confirmed, there can be no assurance that the Effective Date will occur.

### 3. Uncertainty Regarding Objections to Claims

The Plan provides that certain objections to Claims can be filed with the Bankruptcy Court after the Effective Date. A creditor may not know that its Claim will be objected to until after the Effective Date.

### 4. Performance of Obligations by the Debtor under the Plan

Although the Debtor and the Reorganized Debtor believes that it can successfully perform all of its obligations under the Plan, there can be no assurance that the Reorganized Debtor will do so. This could result in a subsequent liquidation of the Debtor.

## XI. CONCLUSION AND RECOMMENDATION

The Debtor believes that confirmation and implementation of the Plan is preferable to any alternative. In addition, any other alternative would involve significant delay, litigation, uncertainty, substantial additional administrative costs, and may result in the Debtor's liquidation. The Debtor urges holders of Impaired Claims and Equity Interests to vote in favor of the Plan.

Dated: May 31, 2011

DISCLOSURE STATEMENT FILED BY:

Beltway 8 Associates, L.L.C., General Partner,
Beltway 8 Associates, Limited Partnership

By: s/ *Joseph T. Spinosa, Jr.*
Joseph T. Spinosa, Jr., Manager

STEFFES, VINGIELLO & McKENZIE, LLC
13702 Coursey Boulevard, Bldg.3
Baton Rouge, Louisiana 70817
Telephone: 225.751.1751
Fax: 225.751.1998
Email: *bsteffes@steffeslaw.com*
By: s/ *William E. Steffes*
    WILLIAM E. STEFFES #12426
    PATRICK S. GARRITY #23744